IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COUNTESS CARY,<br><br>   Plaintiff,<br> v.<br><br>NORTHEAST ILLINOIS REGIONAL<br>COMMUTER RAILROAD CORPORATION d/b/a<br>METRA RAIL,<br><br>   Defendant. | Case No. 19-cv-3014<br><br>Jury Trial Requested |

## **COMPLAINT**

Plaintiff Countess Cary, by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendant Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra Rail ("Defendant" or "Metra" or the "Agency") and states as follows:

## **OVERVIEW**

1. Cary, a 61-year old African American woman, worked for Metra from 1998 until October 2018, when she was constructively discharged after an extended period of discrimination, harassment, and retaliation. Despite two decades of exemplary service but consistent with the Metra's pattern or practice of race discrimination and retaliation against African American women in particular, Metra subjected Cary—its own Senior Director of EEO and Diversity Initiatives—to unlawful discrimination as an African American female. Metra also retaliated against Plaintiff after she complained about her own unlawful treatment and that of other Metra employees, and Metra's violations of Federal transit laws. As a result of Metra's unlawful conduct, Cary's career and reputation have been harmed. Cary now seeks redress for her mistreatment and unlawful termination.

## JURISDICTION AND VENUE

2. Plaintiff's claims arise under[1] 29 U.S.C. § 701 *et. seq.,* 740 ILCS § 174 *et. seq.*, 740 ILCS 23/1 *et. seq.*, and common law; and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 & 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff worked in this District, and a substantial part of the unlawful conduct alleged in this Complaint occurred in this District.

## PARTIES

4. Metra is a public corporation and Transportation Agency created under the Regional Transportation Authority Act, 70 ILCS 36.15/1.01 *et. seq*. Metra is one of the largest commuter rail systems in North America, serving Cook, DuPage, Will, Lake, Kane, and McHenry counties in Northeastern Illinois. Metra employs approximately 2900 people. Metra's fifteen-person Executive Team includes only one African American, who serves in a "diversity" role. Likewise, its Board of Directors is largely comprised of white men.

5. Plaintiff Countess Cary worked for Metra beginning in 1998 through October 2018, when she was constructively discharged.

## FACTUAL ALLEGATIONS

6. Metra recruited Cary to serve as the Director of Equal Employment Opportunity and Employee Relations in 1998 on account of her extensive legal and corporate background, particularly her employment experience in diversity and inclusion. Based on her exemplary

---

[1] Plaintiff has filed a charge of race and gender discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), which was simultaneously filled with the Illinois Department of Human Rights pursuant to a work-share agreement. Plaintiff intends to amend this Complaint to include claims of race and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* Title I of the Americans with Disabilities Act ("ADA"), and the Illinois Human Rights Act after she has exhausted her administrative remedies.

2

work, Metra promoted Cary to Senior Director of EEO and Diversity Initiatives in 2009. Throughout her employment with Metra, Plaintiff discharged the duties assigned to her competently, substantially meeting Metra's legitimate performance expectations.

7. In or around September 2015, Metra hired Michael D. Jones to serve as its new Chief Human Resources Officer ("CHRO"), despite allegations that Jones engaged in discrimination, harassment and retaliation while employed at Dallas Area Rapid Transit ("DART"). Even prior to his hire, as part of the new hire process, Cary had been told that HR had determined that Jones was not the best qualified candidate for the CHRO position and that his application had been placed in the "reject pile" by the former CHRO, Brenda Smith.

8. Cary was further told that Smith received direction from Metra's CEO that Jones would be interviewed despite the fact that he was not the strongest of the candidates. At Metra, the CEO had final hiring authority and authority to overrule recommendations of EEO or HR. Indeed, while Cary advocated that the Federal Transit Administration ("FTA") Circular required that the EEO Officer concur on hires and promotions, Metra's prior Deputy Executive Director, Alex Wiggins, asserted that the EEO Officer was only to concur regarding the process and not to review every hire or promotion.

9. Once hired by Metra in a manner that did not allow for full vetting or participation by either HR or EEO, Jones almost immediately exhibited homophobic, sexist and racist views and was particularly hostile to Cary and her EEO staff. For example, while there was no legal basis for Wiggins' proposed limitations on the role of the EEO Officer, after Jones' hire, Jones and the Executive Team continued the effort to limit the EEO Officer's involvement in the hiring and promotion process.

10. Because Jones was the CHRO, HR employees who were the victims of the hostile work environment and/or unlawful discrimination and retaliation turned to Cary for support. These employees were often frightened of retaliation, fully aware that making a complaint against the CHRO was not only a futile act but would also likely result in the end of their careers. In addition to seeking informal counseling from Cary, employees sent anonymous letters to the Metra Board. As a result of Jones' conduct toward Cary and her staff, Cary knew that Jones harbored views that were not consistent with Metra's stated objectives of inclusion and equal employment and were harmful to Metra's employees.

11. In addition to counseling employees, Cary was vocal in her opposition to Jones' unlawful conduct and lack of competence. Instead of investigating Jones, Metra's executives subjected Cary and her team to a fierce campaign of discrimination and retaliation and a hostile work environment for siding with its employees rather than Jones. Cary was expected to support management against the employees who raised concerns and her failure to do so caused Metra's executives to perceive Cary as a disloyal outsider to Metra's executives. Eventually, Cary was excluded from the executive team.

12. Whereas before Jones' employment, there may have been opposition by Metra's executives to the involvement of any EEO Officer to hiring and promotion decisions, the opposition was not directed at Cary in a personal manner. On the contrary, Metra respected Cary's knowledge and expertise in EEO matters, and she received strong performance reviews. After Jones' hire, Metra's executives openly challenged Cary's competence both on account of Jones and in retaliation for Cary's truthful acknowledgement of discriminatory and retaliatory conduct against Metra employees. In particular, Metra's goals shifted from investigating and

addressing discrimination or retaliation to suppressing it and attacking anyone who interfered with the effort to refute such allegations.

13. Eventually, Jones left Metra but the perception of Cary as a disloyal outsider continued after he departed. Cary was subjected to further abuse, micro management, hostility, unwarranted criticism, racial stereotypes, and bullying. Indeed, Cary's efforts to perform most aspects of her job were met with disrespect, hostility, confrontation, false accusations of wrongdoing or incompetence, name-calling, raised voices and ridicule.

14. When Cary repeatedly complained that Metra was violating federal transit laws by excluding her department from EEO functions, Cary and her department were subjected to a continual pattern of harassment, abuse, investigation, bullying and false allegations. See 49 U.S.C. 5332(b); FED. TRADE ADMIN., EEO CIRCULAR 4704.1A, *available at* https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/regulations-and-guidance/civil-rights-ada/56501/eeo-circular-c-47041a.pdf.

15. Consistent with its effort to stifle debate on EEO claims and to further harass and embarrass Cary, Metra combined its EEO/Diversity Initiatives Department with its Office of Business Diversity and Civil Rights to create a Diversity and Civil Rights Division and appointed Janice Thomas, who had previously headed supplier diversity, as Senior Division Director. Unlike Cary, Thomas did not possess a law degree or decades of EEO experience. By design, Thomas would defer to other executives in HR or legal to refute or contest allegations of discrimination or retaliation.

16. Instead of addressing Cary's well-founded concerns, Metra and its executives placed full effort into a campaign of retaliation designed to force Cary to resign just short of collecting her full pension, including diminishing her role, falsely accusing her of misconduct,

5

and treating her with hostility. In this hostile work environment, Cary was marginalized, berated, excluded from job-related meetings and communications, publicly defamed and otherwise abused. Moreover, Metra constantly questioned and undermined Cary's performance of her job both to Cary and others, thereby making it clear that anyone who associated with Cary was in danger of losing his or her job.

17. The retaliation continued even after Cary retained counsel and met with Metra's head of legal and outside counsel to seek relief from the unlawful treatment. Instead of eliminating the hostility, Metra limited Cary's access to executives and further diminished her responsibilities by, among other things, reviewing and setting goals for Cary's staff without her, micromanaging her work, steering work away from her department, and constantly watching and documenting Cary's daily activities.

18. Metra's campaign of harassment and the hostile work environment, discrimination, and retaliation conduct caused Cary extreme emotional distress. Cary became so ill from the cumulative treatment and hostile work environment that she was unable to go to work and was under medical treatment for extreme anxiety.

19. On her doctor's recommendation, Cary took approximately three months of protected medical leave. Instead of allowing Cary to recover, Metra interfered with her medical leave, placing requirements upon her not applied to others who had not engaged in protected activity. Rather than follow her doctor's instructions that Cary avoid unnecessary stress, Metra sent Cary emails and requests, and questioned the legitimacy of her leave, exacerbating her condition. For example, on the eve of Labor Day weekend, Cary received another letter noting that her approved leave until September 18, 2018, had been cut to September 4, 2018, leaving

her to scramble to reach out to her doctor over the holiday. Metra had engaged in similar conduct around the 4th of July.

20. When Cary's doctor finally approved her to return to work, it was with full disclosure that Cary was suffering from an anxiety disorder and should avoid stress. Knowing of her disability and need for accommodation, upon Cary's return, on October 5, 2018, Metra isolated Cary in a room, and demanded that she prepare a written response by the end of the day to a document that criticized Cary and her department. Metra advised that if Cary needed more time that her new boss would decide "how long, if any" of an extension would be necessary. Cary was also advised that the document discussed her "disgruntled attitude toward Metra (and certain Metra officers)"—a clear reference to Cary's opposition to the discrimination, harassment and retaliation of Metra employees and herself, which Cary openly shared with the investigator.

21. When Cary was presented with the document, she fully understood that Metra had used the time that she had been ill to set her up for termination. Cary also knew that leaving Metra then would cause her to lose approximately $20,000 per year for the rest of her life in pension benefits. However, the work environment was so hostile and intolerable that when Cary attempted to respond to the report and defend her good name and the work of her team, she experienced a massive anxiety attack, relapsed, and was unable to remain on Metra's premises. She resigned the next working day.

22. As a result of the discrimination and retaliation Cary suffered at Metra, Cary lost wages and other benefits, including significant pension income, and suffered extreme emotional distress. Her career and reputation have been irreparably damaged as a result of Defendant's unlawful conduct. Plaintiff suffered non-pecuniary losses as a direct result of Defendant's conduct. Punitive damages are appropriate due to Metra's willful and wanton conduct. As

alleged, Cary's treatment was not only retaliatory for her opposition to discrimination but consistent with a pattern of discrimination against African American female Metra employees. At her age and given the reputational damage done, it is unlikely Cary will ever secure comparable employment.

## COUNT I
### VIOLATION OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. §§ 701 *et. seq.*

23. Cary realleges paragraphs 1 through 22 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

24. The Rehabilitation Act of 1973, 42 U.S.C. §§ 701 *et. seq.,* as amended, prohibits federal grant recipient employers from discriminating against an otherwise qualified individual with an actual or perceived disability in its programs or activities. 29 U.S.C. § 794.

25. Metra is covered by the Rehabilitation Act because it is an instrumentality of local government that receives federal financial assistance. 29 U.S.C. § 794(b)(1)(A).

26. Cary was a qualified individual with a disability under the Act because she had been diagnosed with an anxiety disorder, which impacted one or more of her major life functions such as work, and Metra regarded her or perceived her as having such impairment. 29 C.F.R. § 1630.2(1).

27. At all relevant times, Cary could perform the essential functions of her positions with the Bureau with a reasonable accommodation.

28. Cary informed Metra about her disability and requested a reasonable accommodation—that Metra not subject Cary to an unduly stressful environment or inflict unnecessary stress—but Metra refused to accommodate her. *See Alexander v. Choate*, 469 U.S.

8

287, 300–01 (1985) (reading a duty to accommodate into the Rehabilitation Act); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672–73 (7th Cir. 2012) (applying *Alexander*).

29. Metra discriminated and retaliated against Cary by ignoring her doctor's orders and isolating her in a room and demanding that she promptly respond to pages of spurious criticism of Cary and her department without the aid of her files or team.

30. As a direct and proximate result of Defendant's conduct, Cary has suffered damages.

31. By reason of Defendant's discrimination, Cary is entitled to all legal and equitable remedies available for violations of the Rehabilitation Act.

## COUNT II

### DISCRIMINATION AND RETALIATION IN VIOLATION OF ILLINOIS CIVIL RIGHTS ACT OF 2003 740 ILCS 23/1 *et. seq.*

32. Plaintiff realleges paragraphs 1 through 22 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

33. Metra is a local government entity subject to the Illinois Civil Rights Act.

34. Metra discriminated and retaliated against Cary in violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et. seq.,* by denying her benefits of employment on the basis of their color, gender, and/or race and her complaints of discrimination.

35. Metra also violated the Illinois Civil Rights Act by utilizing criteria or methods of administration that had the effect of subjecting Cary to discrimination because of her color, gender, and/or race.

36. As a result of Metra's actions, Cary suffered lost wages, emotional distress, and reputational damage.

37. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the Act.

## COUNT III

### RETALIATION IN VIOLATION OF
### ILLINOIS WHISTLEBLOWER ACT
### 740 ILCS 174 *et. seq.*

38. Plaintiff realleges paragraphs 2 through 5 and 14 through 22 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

39. The Illinois Whistleblower Act prohibits employers from threatening or retaliating against any employee "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20; 740 ILCS 174/20.2.

40. Metra was an "employer" subject to the act because it is a "unit of local government" or an agency thereof. 740 ILCS 174/5.

41. Cary was an "employee" under the Act because she was employed by Metra. *Id.*

42. As alleged above, Metra constructively discharged Cary for complaining about and refusing to participate in violations of civil rights laws and Federal transit laws. *See* 49 U.S.C. 5332(b).

43. As a result of Metra's willful and wanton conduct, Cary suffered lost wages, emotional distress, and reputational damage.

44. By reason of Defendant's retaliation, Plaintiff is entitled to all legal and equitable remedies available for violations of the Act. 740 ILCS 174/30.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

45. Plaintiff realleges paragraphs 2 through 5, and 20 through 22 and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

46. Metra intended that its conduct would inflict severe emotional distress, or recklessly or consciously disregarded the probability of causing Cary emotional distress. The Agency had seen Cary's earlier nervous breakdown, which had forced her onto medical leave; knew of her diagnosed anxiety disorder; and had received copious medical records detailing her mental health and supporting a reasonable accommodation, including a reduction in undue stress.

47. Metra engaged in willful and wanton, extreme and outrageous conduct when it isolated Cary in a room on the day she returned from medical leave and subjected her to hours of false accusations about one of her investigation without permitting her access to her related files or counsel on threat of termination.

48. "Motivated by a retaliatory animus, [Metra] imposed arbitrary and punitive hardships" on Cary. *Johnson v. Fed. Reserve Bank of Chicago*, 557 N.E.2d 328, 331 (1990). Metra's actions were the culmination of a sustained retaliatory campaign of harassment after she complained about and refused to participate in Metra's violation of Federal transit law. There was no legitimate purpose served by their actions.

49. Metra's willful and wanton course of action actually and proximately caused Cary severe emotional distress as she relapsed the day she returned to work and has not been able to work.

50. By reason of Defendant's intentional infliction of emotional distress, Plaintiff is entitled to all legal and equitable remedies available.

## COUNT V

### RETALIATORY DISCHARGE
### 740 ILCS 174 *et. seq.*

11

51. Plaintiff realleges paragraphs 2 through 5 and 14 through 22 and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

52. Metra's conduct resulted in her de facto termination on or about October 8, 2018.

53. Metra discharged Cary in retaliation for her reporting its illegal and improper conduct in contravention of a clearly mandated public policy.

54. As a direct and proximate result of Metra's willful and wanton conduct, Plaintiff is entitled to all legal and equitable remedies available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendant as follows:

   a. Declare that Metra's acts, conduct, policies, and practices are unlawful and violate the Rehabilitation Act, the Illinois Whistleblower Act, the Illinois Civil Rights Act, and common law;

   b. Award Plaintiff the value of all compensation and benefits lost and that she will lose in the future as a result of Defendant's unlawful conduct;

   c. Award Plaintiff compensatory and punitive damages;

   d. Award Plaintiff prejudgment interest and attorneys' fees, costs, and disbursements, as provided by law; and

   e. Award Plaintiff such other make-whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and retaliation and fairly compensate Plaintiff.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

                                        Respectfully submitted on behalf of Plaintiff and those similarly situated,

                                        */s/ Linda D. Friedman*
                                        STOWELL & FRIEDMAN, LTD.

Linda Debra Friedman
STOWELL & FRIEDMAN, LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
lfriedman@sftld.com