## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| COUNTESS CARY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19 C 03014 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD CORPORATION | ) | |
| d/b/a METRA RAIL, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Countess Cary used to work for the Chicago-area suburban railroad company known as Metra. She was the Senior Director of EEO and Diversity Initiatives for Metra, but alleges that her former employer engaged in a campaign of discrimination, harassment, and retaliation against her after a leadership change in September 2015. This persistent harassment allegedly caused Cary to develop an anxiety disorder that left her temporarily unable to work. After Cary returned from medical leave, Metra allegedly forced her to quit. Cary then filed this lawsuit, alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq.*, the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et. seq.*, the Illinois Whistleblower Act, 740 ILCS 174 *et. seq.*, and Illinois common law. R. 1, Compl.[1] Metra has moved to dismiss all the claims. R. 19,

---

[1]This Court has subject matter jurisdiction over the federal claim in this case under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Mot. Dismiss. For the reasons explained below, Metra's motion is granted as to the disparate treatment and retaliatory discharge claims, but is otherwise denied.[2]

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Countess Cary is an African American woman who worked for Metra from 1998 until October 2018. Compl. ¶ 1. Metra first recruited Cary in 1998 to serve as its Director of Equal Employment Opportunity (EEO) and Employee Relations. *Id.* ¶ 6. In 2009, she was promoted to Senior Director of EEO and Diversity Initiatives. *Id.*

Around September 2015, Metra hired Michael D. Jones as its new Chief Human Resources Officer, despite allegations that he had engaged in discrimination, harassment, and retaliation while employed at Dallas Area Rapid Transit. Compl. ¶ 7. Metra's Human Resources department deemed Jones unqualified, and likewise, the outgoing-Chief HR Officer, Brenda Smith, rejected his candidacy. *Id.* Nonetheless, Metra's CEO directed Smith to interview Jones for the job. *Id.* ¶ 8. When Cary then tried to intervene in Jones's hire through her role as EEO Officer—citing a Federal Transit Administration Circular requirement that she concur in hires and promotions—she was blocked by Metra's Deputy Executive Director. *Id.* Metra then hired Jones without the full vetting or participation of either Human Resources or the EEO Officer (that is, Cary). *Id.* ¶ 9.

---

[2]The Court already denied the dismissal motion in part; specifically, the motion's challenge to the Rehabilitation Act claim was rejected. *See* R. 31.

As the new Chief HR Officer, Jones was hostile to Cary and her EEO staff and exhibited homophobic, sexist, and racist views. Compl. ¶ 9. Together with other executives, Jones continued to restrict Cary's role in the hiring and promotion process. *Id*. Some of the HR employees who were suffering from a hostile work environment, unlawful discrimination, and retaliation under Jones turned to Cary for support and also wrote anonymously to the Metra Board. *Id*. ¶ 10. Yet, when Cary vocally opposed Jones's unlawful behavior and incompetence, Metra executives, rather than investigate Jones, subjected Cary to discrimination, retaliation, and a hostile work environment for siding with the employees. *Id*. ¶ 11. Metra's executives perceived Cary as disloyal for failing to support management's efforts to quash employee concerns. *Id*. Eventually, Metra excluded Cary from the Executive Team, which is a 15-member group of Metra executives. *Id*. Jones's hiring also marked a turning point in Metra's view of Cary's performance. Before, Metra had respected Cary's knowledge in EEO matters and given her strong performance reviews. After, Metra executives openly challenged Cary's competence, both at Jones's urging and also in retaliation for Cary's acknowledgment of discriminatory and retaliatory conduct against Metra employees. *Id*. ¶ 12. According to Cary, Metra's goals shifted from investigating and addressing discrimination and retaliation to suppressing inquiries and attacking anyone who interfered in the effort to refute complaints. *Id*.

Even after Jones eventually left the company, Metra allegedly continued to subject Cary to abuse, micromanagement, hostility, unwarranted criticism, racial stereotypes, and bullying. Compl. ¶ 13. When she complained that Metra had violated

federal transit laws by excluding her department from EEO functions, she and her department were subjected to harassment, abuse, investigation, bullying, and false allegations. *Id*. In fact, in an apparent effort to stifle debate on the EEO complaints and further harass and embarrass Cary, Metra combined Cary's department with another and installed a department leader who had neither the law degree nor decades of EEO experience that Cary had, further diminishing Cary's role. *Id*. ¶¶ 15-16. Cary alleges that she continued to be treated with hostility, accused of misconduct, marginalized, berated, excluded from job-related meetings and communications, publicly defamed, and otherwise abused. *Id*. ¶ 16.

Eventually, Cary retained outside counsel and met with the head of the legal department to seek relief. Compl. ¶ 17. That did not work. *Id*. Rather than address the problems, Metra retaliated against Cary by limiting her access to executives, which ended up diminishing her responsibilities even more. *Id*. Plus, Metra started to review and set goals for Cary's staff without her, micromanaged her work, steered work away from her department, and constantly watched and documented Cary's daily activities. *Id*.

Ultimately, the discrimination and harassment caused Cary to suffer from extreme anxiety, all the way to the point that she sought out medical treatment and was temporarily unable to work. Compl. ¶ 18. In 2018, Cary took around three months of protected medical leave at the recommendation of her doctor. *Id*. ¶ 19. Even during the time off, Metra harassed her by sending her emails and requests questioning the legitimacy of her condition. *Id*. On the eve of two holiday weekends,

July 4 and Labor Day, Metra notified Cary that her leave would be cut short, forcing her to rush to reach her doctor over each of the holiday periods. *Id.*

When her doctor finally approved Cary's return from medical leave, the doctor imposed a condition: Cary should avoid stress. Compl. ¶20. But when Cary returned in early October 2018, Metra—despite full awareness of Cary's anxiety disorder and her need for accommodation—isolated Cary in a room and ordered her to draft responses to a document criticizing her and her department by the end of the day, and to do so without access to either her notes or her team. *Id.* ¶¶ 21, 29. She was also told that the document discussed her "disgruntled attitude toward Metra (and certain Metra officers)." *Id.* To Cary, it was clear that Metra had used her medical leave to set her up to be fired. *Id.* ¶ 21. She experienced a "massive anxiety attack" and resigned the next working day. *Id.* Because Cary resigned right before her imminent pension-eligibility date, the resignation cost her around $20,000 per year in lifetime pension benefits. *Id.* Cary also seeks damages for lost wages and other benefits, emotional distress, and irreparable career and reputational damage. *Id.* ¶ 22.

Cary now brings claims against Metra for violating her rights under the federal Rehabilitation Act, the Illinois Civil Rights Act, the Illinois Whistleblower Act, and Illinois common law for discriminating against her on the basis of race and disability, retaliating against her, intentionally inflicting emotional distress, and constructively discharging her from the company upon her return from medical leave. Compl. ¶¶ 23-54.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

In the employment-discrimination context, the pleading requirement is minimal. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) ("[A] plaintiff alleging employment discrimination under Title VII may allege these claims quite generally."). All the plaintiff must include in the complaint is the "type of discrimination the plaintiff thought occurred," "by whom," and "when." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)); *see also Freeman v. Metro. Water Reclamation Dist. of Greater Chicago*, 927 F.3d 961, 965 (7th Cir. 2019) (saying that "I was turned down for a job because of my race" is all that a complaint has to say to make out a discrimination claim). That is because employers are "familiar with discrimination claims and know how to investigate them." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). Thus, little information is required "to put the employer on notice of these claims." *Id.*

### III. Analysis

### A. The Illinois Civil Rights Act

Cary asserts claims under the Illinois Civil Rights Act for disparate treatment, disparate impact, and retaliation. The Court addresses each in turn.

### 1. Disparate Treatment

First, Cary alleges that Metra engaged in disparate-treatment discrimination on the basis of her race, color, and gender, as well as her "complaints of discrimination." Compl. ¶ 34. As a threshold matter, Metra's initial argument is that the Civil Rights Act does not cover disparate-*treatment* discrimination at all, because

the Act only authorizes disparate-*impact* claims. Metra cites two cases for that proposition: *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 2015 WL 4537038, 2015 IL App (5th) 140443-U (Ill. App. Ct. July 27, 2015); and *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010). But neither case is a winner for Metra. First, *LaRiviere* is an *unpublished* Illinois Appellate Court opinion, so it cannot be cited as precedent under Illinois Supreme Court Rule 23(e). *See* Ill. Sup. Ct. Rule 23(e) ("An order entered under subpart (b) or (c) of this rule is not precedential and may not be cited by any party," with certain exceptions not applicable here). And *Jackson v. Cerpa* says nothing of the sort. That case simply discussed whether the employees had presented enough evidence of a disparate impact to survive summary judgment. *Jackson*, 696 F. Supp. 2d at 963. Nothing in the opinion says anything about limiting the Illinois Civil Rights Act only to disparate-impact claims.

In any event, by its plain text, the Act encompasses both disparate-treatment and disparate-impact claims in two sub-sections: Section 5(a)(1) prohibits governmental employers from "subject[ing] a person to discrimination … on the grounds of that person's race, color … or gender," whereas Section 5(a)(2) prohibits criteria or methods of administration "that have the effect of subjecting individuals to discrimination … ." 740 ILCS 23/5; *see also Rao v. Gondi*, 2014 WL 5423441, at *5 (N.D. Ill. Oct. 23, 2014). So Section 5(a)(1) expressly bars subjecting someone to discrimination, that is, to disparate treatment. In contrast, Section 5(a)(2) allows a disparate-impact claim to challenge employment practices that have the "effect" of

discrimination. So Cary can invoke Section 5(a)(1) to bring a disparate-treatment claim under the Act.

Moving on to the merits of the claim, because the Act is patterned after Title VI of the Civil Rights Act of 1964, courts look to federal civil-rights statutes to guide the interpretation of the Act. *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (collecting cases). To state a claim for disparate treatment, a plaintiff must allege that an employer "took job-related action against him which was motivated by intentional discrimination." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (interpreting Title VII). Those adverse employment actions may include: "(1) diminishing an employee's compensation, fringe benefits, or other financial terms of employment, including termination; (2) reducing long-term career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted; and (3) changing the conditions in which [an employee] works … in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Id.* at 552 (cleaned up). In light of the federal-discrimination law model adopted by the Illinois Civil Rights Act, the Court will apply those same principles to Cary's claim under the Act.

Under this analytical framework, Cary has sufficiently pled a disparate-treatment claim. The Complaint sets forth myriad ways in which Metra reduced Cary's long-term career prospects and otherwise significantly changed the conditions of her employment: (1) excluding her from the 15-member Executive Team after she

opposed Metra's allegedly unlawful hiring practices, Compl. ¶ 11; (2) effectively demoting her underneath a less-qualified individual through internal restructuring, *id*. ¶¶ 15-16, (3) steering work away from her department, *id*. ¶ 17, (4) openly challenging her competence, *id*. ¶ 12, (5) engaging in hostile, bullying, abusive behavior toward her that included racial stereotyping and unwarranted criticism, *id*. ¶ 13, (6) diminishing her responsibilities, *id*. ¶ 17, and (7) limiting her access to executives, *id*. Moreover, Cary has alleged that Metra's mistreatment of her was "not only retaliatory for her opposition to discrimination but consistent with a pattern of discrimination against African American female employees." *Id*. at ¶ 22. Therefore, the Complaint alleges, "Metra discriminated and retaliated against Cary … by denying her benefits of employment on the basis of [her] color, gender, and/or race," as well as her complaints against discrimination. *Id*. at ¶ 35. At the pleading stage, this is all that Cary must plead to survive a motion to dismiss. *See Freeman*, 927 F.3d at 965.

## 2. Disparate Impact

Moving on to the disparate-impact claim, here, too, the Court turns to the federal-law analogue to interpret the Illinois Civil Rights Act. *Weiler*, 86 F. Supp. 3d at 889. Under federal law, to adequately state a disparate-impact claim, the plaintiff must allege that a "specific, facially neutral employment practice cause[s] a significantly disproportionate adverse impact based on [the protect class]." *Carson v. Lake County, Indiana*, 865 F.3d 526, 536 (7th Cir. 2017). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy

that leads to such an impact." *Smith v. City of Jackson,* 544 U.S. 228, 241 (2005). And while the plaintiff need not allege statistical evidence to survive a motion to dismiss, *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 906-7 (N.D. Ill. 2011), the complaint nonetheless must allege some basic facts of the disparity between relevant groups caused by the employment practice. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1007 (7th Cir. 2019).

Here, it is not clear what facially neutral employment practice Cary asserts has caused a disparate impact. Cary has at most alleged that (1) she was excluded from Metra's Executive Team, Compl. ¶ 11; and (2) she was excluded from participation in Metra's hiring and promotion process, *id.* ¶¶ 8-9, 14. But neither of those allegations suggests that there is some neutral employment practice that was applied to her and thereby had a disparate impact on her (or, for that matter, any other employee). Again, it is true that no statistics are needed and sometimes an impact on one employee will be enough to plead disparate impact. But the Complaint does not identify what neutral employment practice was at play. So this claim is dismissed, though without prejudice to amending the Complaint. If Cary wishes to fix the disparate-impact claim, then she may file an amended complaint by April 24, 2020. Otherwise, the dismissal of this claim will become a dismissal with prejudice.

### 3. Retaliation

Cary also brings a claim of retaliation against Metra under the Illinois Civil Rights Act. As a threshold issue, Metra contends that the Act does not authorize a cause of action for retaliation. Mot. Dismiss at 13. In support of this contention, Metra

relies on the concurring opinion in *Illinois Native American Bar Association v. University of Illinois*, 856 N.E.2d 460, 469 (Ill. App. Ct. 2006) (Hoffman, J., concurring). The concurring opinion relied on the absence of an explicit textual reference in the Civil Rights Act to "retaliation" claims, whereas the Illinois Human Rights Act contains an explicit ban on retaliation, 775 ILCS 5/6-101(A). *Ill. Native Amer. Bar Ass'n*, 856 N.E.2d at 469 (Hoffman, J. concurring). Although the Court understands that line of reasoning, the United States Supreme Court has interpreted several anti-discrimination statutes to prohibit retaliation—even absent an explicit textual reference to "retaliation"—because retaliation *is* a form of discrimination and enforcement of anti-discrimination statutes would be undermined if it were not interpreted that way. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452-53 (2008) (42 U.S.C. § 1981); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176-77 (2013) (Title IX); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (42 U.S.C. § 1982). So when the Illinois Civil Rights Act bans "discrimination" by units of government, 740 ILCS 23/5(a)(1), that term can encompass retaliation claims.

What's more, as discussed earlier, the Act was "patterned on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits race and national origin discrimination in federally assisted programs." *Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (citing 93 Ill. Gen. Assemb., H. Deb., April 3, 2003, at 146 (statements of Rep. Fritchey ("[T]his Bill will create a parallel state remedy to … the federal cases that were brought under Section 601 of the Civil Rights Act"))). And although Title VI, too, does not explicitly refer to a "retaliation" cause of action,

federal courts have nonetheless concluded that Title VI authorizes claims for retaliation. *Weiler*, 86 F. Supp. 3d at 889-90; *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 Fed. Appx. 906, 911 n.8 (11th Cir. 2013) (unpublished opinion); *Cabrera–Diaz v. Penn Kidder Campus Jim Thorpe Sch. Dist.*, 2010 WL 5818289, at *10 (M.D. Pa. Aug. 9, 2010), report and recommendation adopted, 2011 WL 613383 (M.D. Pa. Feb. 11, 2011); *Hickey v. Myers*, 2010 WL 786459, at *4 (N.D.N.Y. Mar. 2, 2010); *Silva v. St. Anne Catholic Sch.*, 595 F. Supp. 2d 1171, 1187 (D. Kan. 2009); *Rubio v. Turner Unified Sch. Dist. No. 202*, 523 F. Supp. 2d 1242, 1253 (D. Kan. 2007); *Gutierrez v. State of Wash., Dep't of Soc. & Health Servs.*, 2005 WL 2346956, at *5 (E.D. Wash. Sept. 26, 2005). This long line of cases is not surprising, because Title IX was modeled on Title VI, *Fitzgerald v. Barnstable Sch. Committee*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964"), and the Supreme Court has held that Title IX does authorize claims for retaliation, *Jackson*, 544 U.S. at 176. In light of the link between the Illinois Civil Rights Act and Title VI, this Court agrees with *Weiler*: the Act allows for claims of retaliation.

To plead a claim of retaliation, a plaintiff must allege that (1) she has engaged in a protected activity; (2) the employer engaged in conduct sufficient to dissuade a reasonable employee from engaging in protected activity; and (3) that there is a causal link between the two. *Alamo v. Bliss*, 864 F.3d 541, 555 & n.39 (7th Cir. 2017). "Protected activity" includes the "cognizable expression of opposition to discriminatory practices." *Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016). An employee generally may engage in protected activity by either "(1) filing a charge,

testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under [an employment statute], or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). Filing "an official complaint with an employer" may constitute protected activity so long as it alleges that discrimination occurred based on a protected class. *Tomanovich*, 457 F.3d 656, 663-64 (7th Cir. 2006); *see also Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826 (7th Cir. 2015). Even an informal or verbal complaint may qualify as protected activity. *Davis v. Time Warner Cable of Se. Wis.,* 651 F.3d 664, 674 (7th Cir. 2011) (holding "informal comments" to a supervisor to be "within the scope of protected activity").

Here, Metra argues that Cary has failed to plead any protected activity that would support her retaliation claim. But according to the Complaint, Cary was persistent and vocal in challenging (1) her exclusion from the hiring and promotion process, in violation of federal transit law, Compl. ¶ 14; (2) the unlawful discriminatory treatment of herself and other Metra employees, *id.* ¶ 1; and (3) Metra's expectation that Cary support its efforts to suppress discrimination claims, *id.* ¶ 11. Cary escalated her concerns, both to the head of Metra's legal department, *id.* ¶17, and an investigator, *id.* ¶ 20. Cary has sufficiently alleged that she engaged in protected activity.

Cary has also more than adequately pled an adverse action for purposes of a retaliation claim. Again, relying on the federal anti-discrimination analogue of Title VII, the test is simply "material adversity": whether the employer's retaliatory

conduct would likely deter a reasonable employee from opposing discrimination. *Burlington N. & Santa Fe Rwy. Co v. White*, 548 U.S. 53, 62-63 (2006); *id.* at 68 ("The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining … .") (cleaned up); *see also Thompson v. North Amer. Stainless, LP*, 562 U.S. 170, 173 (2011) (describing holding of *Burlington:* "we held that Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct"). To repeat an earlier listing, Cary alleges that she: (1) was excluded from the Executive Team, Compl. ¶ 11; (2) was demoted through internal restructuring to be underneath a less-qualified individual, *id.* ¶¶ 15-16; (3) lost work that was steered away from her department, *id.* ¶ 17; (4) experienced open challenges from Metra to her competence, *id.* ¶ 12; (5) endured hostile, bullying, and abusive behavior that included racial stereotyping and unwarranted criticism, *id.* ¶ 13; (6) faced diminished job responsibilities, *id.* ¶ 17; and (7) had her access to executives limited by Metra. *Id.* All of this mistreatment, Cary alleges, was "retaliatory for her opposition to discrimination." *Id.* ¶ 22. These allegations readily satisfy the test for misconduct that would likely dissuade an employee from complaining about discrimination. The retaliation claim is adequately pled.

## B. Illinois Whistleblower Act

Next, Cary brings two claims under the Illinois Whistleblower Act: (1) retaliation while she worked at Metra; and (2) retaliatory discharge from her employment altogether. The Court addresses each in turn.

### 1. Retaliation During Employment

The Illinois Whistleblower Act protects employee-whistleblowers in a variety of ways; two are pertinent here. First, employees can refuse to participate in breaking the law without fear of reprisal: the Act prohibits employers from threatening or retaliating against any employee "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20. Second, employees are allowed to blow the whistle to alert government investigators, so long as the employee has reasonable cause to believe that the employer has broken the law. 740 ILCS 174/15(b) (barring employers from retaliating when employees disclose "information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation").

Here, Cary alleges that Metra violated the Whistleblower Act by retaliating against her for her opposition to the railroad's hostile work environment, discrimination, and retaliation against employees, Compl. ¶¶ 1, 10-11, and for her complaints that Metra was violating federal transit laws by excluding the EEO Department from the hiring and promotion process, *id.* ¶¶ 8-9, 11-14. In response, Metra advances a litany of arguments (five, to be exact) against this claim.

First, Metra contends that the Whistleblower Act does not apply because Cary did not engage in any protected activity. But Cary does allege that she opposed Metra's refusal to comply with the Federal Transit Administration's (FTA) directive that the EEO Officer play a concurrence role in all hiring and promotion decisions. Compl. ¶ 8. The directive was issued in an FTA Circular (which Metra attaches to its brief, R. 19-1). According to Cary, Metra interpreted the directive as requiring the EEO Officer's concurrence in only the "process" of hiring and promotion, not to review each decision. Compl. ¶ 8. The Court need not decide, right now, whether "concurrence" means the authority to outright disapprove specific hiring or promotion decisions. It is enough to say, at this pleading stage, that the FTA's directive did require EEO Officer concurrence in more than just the generalized hiring and promotion process and in more than just general hiring policies. The Circular says more, specifically that "[c]oncurring in the hiring and promotion process means the EEO Officer has reviewed employment documents to ensure the actions of the agency are not discriminatory," R. 19-1 at 2-4;[4] a "good practice" is to allow "additional time for the EEO Officer to review documents and provide the concurrence," *id.* at 2-5; and the "Sample Concurrence Checklist" includes entries that make sense only if the EEO Officer is reviewing each individual hiring decision rather than just the generalized policy or process, *id.* at A-3 ("Qualification verification of (a) candidates selected for interview, or (b) audit/res-screen all applicants"; "Confirm whether all candidates interviewed are eligible; justification for eligible candidates not interviewed"). So,

---

[4] The page citations to the Circular are to the Chapter and page-number references in the upper-right corner of the document.

setting aside whether concurrence includes the power to outright disapprove a decision, at the very least Cary allegedly opposed a violation of the law by opposing her exclusion from individual hiring and promotion decisions.

Second, Metra challenges whether Cary made a sufficient *outside* disclosure to trigger the protection for reporting illegal activity under Section 15(b) of the Whistleblower Act. Remember that Section 15(b) protects an employee who discloses "information to a government or law enforcement agency" about illegal activity. 740 ILCS 174/15(b). So for disclosures to be protected by the Whistleblower Act, they cannot be made solely to the wrongdoer—they must be made to "a government or law enforcement agency." *Id.*; *Riedlinger v. Hudson Respiratory Care, Inc.*, 478 F. Supp. 2d 1051, 1055 (N.D. Ill. 2007). Here, the Complaint alleges that Cary brought her complaints both to Metra internally and to an "investigator," but the investigator is not described as either internal or external to the company. Compl. ¶¶ 1, 11, 14, 20, 41. At the pleading stage, however, this is enough to get by a dismissal motion. If discovery reveals that the investigator was not external to the company, then Metra may re-raise the issue at summary judgment (assuming Cary does not voluntarily drop this particular theory of liability under Section 15(b)).

Third, Metra argues that Cary's Section 20 claim—retaliation for refusing to participate in breaking the law—is insufficiently pled because she fails to allege that she refused to participate in an illegal activity. Remember that Section 20 prohibits "retaliat[ion] against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20.

As previously discussed in detail, Cary did refuse to participate in Metra's non-compliance with the FTA's directive on the EEO Officer's responsibility to concur in individual hiring and promotion decisions. Compl. ¶ 11. Also, Cary alleges that the she further refused to support Metra's attempt to refute employees' legitimate complaints of discrimination. *Id.* ¶¶ 10-15. Cary has adequately alleged a refusal to participate in illegal activity.

Fourth, Metra argues that the Illinois Human Rights Act preempts the Whistleblower Act claims because those claims are premised on alleged discrimination covered by the Human Rights Act. Mot. Dismiss at 20 (citing *Alexander v. Ne. Ill. Univ.*, 586 F. Supp. 2d 905, 915 (N.D. Ill. 2008)). But the test for preemption is whether the Whistleblower Act can stand alone on an "independent" basis, without reference to the Human Rights Act. *See Maksimovic v. Tsogalis*, 687 N.E.2d 21, 22 (Ill. 1997); *Richards v. U.S. Steel*, 869 F.3d 557, 564 (7th Cir. 2017). If the proposed claim need not refer to the Illinois Human Rights Act to state a valid legal claim, then there is no preemption. *Richards*, 869 F.3d at 564. Here, Cary's claim that Metra retaliated against her for complaining about violations of federal anti-discrimination law and the FTA's directive on EEO Officers both can be established independently without any reference to the Human Rights Act. There is no preemption.

Fifth, Metra maintains that the Whistleblower Act claims are barred by the Tort Immunity Act, 745 ILCS 10/2-201. Under the Tort Immunity Act, a public official who makes a discretionary decision cannot be held liable for an injury resulting from

"his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id*. Metra argues that, because hiring and promotion of employees are quintessential discretionary functions, the immunity of Section 2-201 applies. But the crux of Cary's Whistleblower Act claim is Metra's retaliation against her for reporting violations of federal civil-rights laws and the FTA directive on the EEO Officer's role. That type of retaliation does not enjoy immunity because it is not a form of policy-making that balances a variety of interests. *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 919 (N.D. Ill. 2016). Moreover, the Tort Immunity Act is an affirmative defense that often requires a fact-intensive inquiry; here, there is no basis to apply the immunity just based on the Complaint itself. In sum, the Whistleblower Act claim for retaliation during employment survives the dismissal motion.

### 2. Retaliatory Discharge

Metra also challenges Cary's claim for retaliatory discharge under the Whistleblower Act. Cary alleges that Metra constructively discharged her right after she returned from medical leave. In the Seventh Circuit, there are two forms of constructive discharge. The first occurs when a plaintiff resigns due to "discriminatory working conditions even more egregious than that required for a hostile work environment claim." *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). The second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign. *Id*. The severity of the harassment is judged "from the perspective of

a reasonable person in the plaintiff's position, considering all the circumstances." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000).

Taking the alleged facts as true, the Complaint adequately alleges a constructive discharge. First, in addition to stripping-down the responsibilities of Cary's job to the point of causing extreme anxiety needing medical intervention, Compl. ¶ 15, the harassment continued even when Cary went on medical leave, including last-minute, holiday-weekend demands for medical confirmation, *id.* ¶ 19. And when she returned, Metra's first act—with full knowledge of the medical accommodation to avoid stress—was to isolate her in a room, away from her notes and her team, to write an answer to spurious criticism of herself and her department. *Id.* ¶ 20-21, 29. The fact that she was cut off from her notes and team in the process is key because it gives every implication that this assignment was not a genuine professional exercise but rather continued harassment, and it would be reasonable for a person in Cary's situation to see the writing on the wall: she was about to be fired. This course of haranguing went well beyond the circumstances in the case that Metra cited. *See Arias v. Citgo Petroleum Corp.*, 2019 WL 4735391, at *4 (N.D. Ill. Sept. 27, 2019) (employee was assigned to the night shift despite a medical need for reduced hours, but received accommodation including a special office to handle his condition). (Metra also cited *LaRiviere*, but that unpublished case, as explained earlier, is not citable under Illinois Supreme Court rules.) The retaliatory discharge claim under the Whistleblower Act remains intact.[5]

---

[5]Although Cary asserts in her opposition brief that she brought a claim for retaliatory discharge under Illinois common law, R. 28 at 18 n.4 ("Count V of the Complaint alleges the

## C. Intentional Infliction of Emotional Distress

The next claim up for consideration is intentional infliction of emotional distress. In Illinois, the tort of intentional infliction of emotional distress has three elements: (1) the defendant's conduct must be truly extreme and outrageous; (2) the defendant must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the defendant's conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Whether the conduct is extreme and outrageous is measured by an objective standard based on all of the particular facts and circumstances. *Id.* at 811.

For this claim, Cary alleges that Metra intentionally caused emotional distress by (1) engaging in a campaign of harassment against her so severe that it gave her anxiety disorder, Compl. ¶ 18; (2) continuing to harass her even during her medical leave, despite knowing about her anxiety disorder, by repeatedly questioning its legitimacy and threating to cut it short on the eve of holiday weekends, *id.* ¶ 19; and (3) when Cary returned to work, isolating her in a room without her team or her records and requiring her to write on-the-spot a response to spurious criticism, *id.* ¶

---

common law tort of retaliatory discharge: that Metra constructively discharged Plaintiff in retaliation"), the Complaint itself alleges retaliatory discharge under "740 ILCS 174," the Whistleblower Act. *See* Compl. at Count V. In any event, *constructive* retaliatory discharge under common law is not cognizable in Illinois. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004) (holding that "only an *actual* termination can support an employee's retaliatory discharge claim under Illinois law"). To the extent that Cary intended to bring a common law constructive discharge claim, it is dismissed. The Whistleblower Act, in contrast, does authorize actions for retaliatory discharge. *See* 740 ILCS 174/30(1) (providing for "reinstatement" as a form of remedy, which only makes sense if discharge is an authorized cause of action).

20-21, 29. This final episode allegedly triggered Cary's massive anxiety attack and relapse, causing her to resign from the company the next working day. *Id*. ¶ 21.

Once again, Metra argues that the Illinois Human Rights Act preempts this claim because of their factual overlap. As explained earlier, however, that is not the right inquiry for preemption. The Court only asks whether the targeted claim can stand alone without the need to refer to the Human Rights Act. *Richards*, 869 F.3d at 564. The answer here is yes. No part of the emotional-distress claim relies on the duties created by the Human Rights Act. Cary would have a viable legal basis for the emotional-distress claim even if the Human Rights Act did not exist. There is no preemption.

Metra further objects that Cary failed to sufficiently plead extreme and outrageous conduct. To qualify as extreme and outrageous, conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Richards,* 869 F.3d at 566. Mere "insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct." *Id*. Nevertheless, "Illinois courts have found extreme and outrageous behavior to exist in the employer, employee context when the employer clearly abuses the power it holds over an employee in a manner far more severe than typical disagreements or job-related stress caused by the average work environment." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). As detailed earlier, the campaign of harassment, threats while on medical leave, and the stressful requirement to write a response to false criticism while stranded in an isolated room

with no access to notes or to any other co-worker are all enough to get past the pleading stage. The emotional-distress claim survives the dismissal motion.

## IV. Conclusion

For the reasons discussed above, Metra's motion to dismiss is granted in part and denied in part. The disparate impact claim is dismissed, but the remaining claims survive, namely, disability discrimination under the Rehabilitation Act; disparate treatment under the Illinois Civil Rights Act; retaliation under the Illinois Whistleblower Act; and intentional infliction of emotional distress. If Cary wishes to fix the disparate-impact claim, then she may file an amended complaint by April 24, 2020. Otherwise, the dismissal of this claim will become a dismissal with prejudice. The status hearing of June 3, 2020 remains in place.

ENTERED:

_____ s/Edmond E. Chang _____
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020